## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **MICHAEL MORISSETTE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **2:14-cv-00452-JDL** |
| | ) | |
| **COTE CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### ORDER ON THE DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Michael Morissette is a heavy equipment mechanic with thirty-five years' experience and a history of artery disease that includes a completely blocked right carotid artery.  In June 2011, he suffered a mild stroke that continues to affect the left side of his body: he claims that his left arm remains somewhat weaker than his right arm and that he occasionally feels numbness in the fingers of his left hand.  The defendant, Cote Corporation ("Cote Corp."), is a company that provides crane and rigging services and other trucking services.   In May 2013, Cote Corp. hired Morissette as its shop mechanic but then terminated him within two weeks.

Morissette and Cote Corp. dispute the basis for his termination.  Cote Corp. asserts that Morissette was insubordinate and unable to cope with the relatively minor stress of obtaining a medical clearance.  Morissette alleges that Cote Corp. discriminated and retaliated against him based on his artery disease and stroke history.

Morissette filed a Complaint in this court alleging that Cote Corp. violated his rights under the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101 *et seq.*; the Maine Human Rights Act (the "MHRA"), 5 M.R.S. § 4551 *et seq.*; and the Maine Whistleblowers' Protection Act (the "WPA"), 26 M.R.S. § 831 *et seq.*[1]  ECF No. 1.  He alleges that he is disabled within the meaning of the ADA and the MHRA by virtue of his stroke history, related neurological disorder, and carotid artery disease, *id.* at 5, ¶ 36, and that Cote Corp. discriminated against him when it terminated his employment on account of his disability, *id.* at 7, ¶¶ 49, 50, 51.  Morissette also contends that Cote Corp. failed to reasonably accommodate his disability, *id.* at ¶ 52, and later retaliated against him by terminating his employment after he requested an accommodation and opposed Cote Corp.'s discriminatory treatment, *id.* at ¶ 53.

Cote Corp. has filed a Motion for Partial Summary Judgment (ECF No. 34) in which it seeks dismissal of Counts I and II of the Complaint (alleging the ADA and MHRA claims, respectively).  For the reasons discussed below, Cote Corp.'s motion is granted in part and denied in part.

## I. FACTUAL BACKGROUND

The following facts are gleaned from Morissette's Complaint (ECF No. 1) and Opposing Statement of Material Facts and Statement of Additional Facts (ECF No. 39) and are viewed in the light most favorable to Morissette, as the non-moving party. *Johnson v. Univ. of P. R.,* 714 F.3d 48, 52 (1st Cir. 2013).

Morissette is a heavy equipment mechanic who, in June 2011, suffered a stroke caused by carotid artery disease that completely blocked his right carotid artery.  ECF

---

[1] Morissette's Whistleblowers' Protection Act claim constitutes Count Three of his lawsuit, *see* ECF No. 1 at 9, and is not at issue in Cote Corp.'s Motion for Partial Summary Judgment.

No. 39 at 11, ¶¶ 1 and 15, ¶ 23.  The stroke caused Morissette to experience "heaviness, weakness[,] and pins and needles in his left arm and hand as well as weakness in his left lower face."  *Id.* at 12, ¶ 8.  The following month, a physical therapy evaluation found that Morissette suffered "left side weakness, mostly in the left hand, with dysmetria (lack of coordination) and decrease in sensation in his left hand."  *Id.*  By November 2012, Morissette's left hand weakness had improved but he continued to experience residual weakness in his left arm, which he estimated to be at 75% of the strength in his right arm.  *Id.*, ¶ 9.  In May 2013, Morissette's right carotid artery remained blocked, but Morissette's treating nurse practitioner, Elizabeth Herdrich, estimated his risk of stroke to be "less than 5% per year for the next 5 years, similar to the general population."  ECF No. 39-6 at 1.  Herdrich did not assess the extent to which Morissette's condition interfered with his major life activities.  *See id.*

Also, in May 2013, Morissette applied to Cote Corp. for a position as a shop mechanic.  ECF No. 1 at 3, ¶ 16.  On his job application form, Morissette answered that he could perform the job "with or without reasonable accommodations," and left blank the line that appeared after "[i]f accommodations are needed, please describe[.]"  ECF No. 39 at 3, ¶ 5.

Morissette was invited to a job interview on May 11.  ECF No. 1 at 3, ¶ 17.  He claims that during the interview, he disclosed the fact that he had a stroke in 2011.  ECF No. 39 at 14, ¶ 16 (citing ECF No. 39-1 at 8).  Daniel A. Cote, Cote Corp.'s chief

executive officer,[2] claims that Morissette did not mention his stroke during the interview and that Cote was "surprised" to hear of it later.  ECF No. 40-2 at 2.

On May 20, Morissette was hired by Cote Corp. as a shop mechanic, and agreed to undergo a United States Department of Transportation ("DOT") medical exam in order to obtain a DOT medical certification ("DOT medical card") which Cote Corp. required as a condition of employment.  ECF No. 1 at 3, ¶ 19; ECF No. 39 at 13, ¶ 14 and 14, ¶ 19; ECF No. 35-2 at 5.  When Morissette returned from the medical exam, Daniel A. Cote asked him how the exam went, and Morissette replied that he did not pass the medical exam because the examiner, Central Maine Partners in Health ("CMPH"), "[was] going to do some more follow-up" as a result of his stroke history. ECF No. 40 at 17.

CMPH later informed Cote Corp. that Morissette would not be issued the DOT medical card until Morissette's doctor provided more information about his stroke. ECF No. 39 at 16, ¶ 27.  Thereafter, Daniel A. Cote questioned Morissette each day about whether his medical records had been provided to CMPH.  *Id.* at ¶ 28.

On May 27, Morissette asked Daniel A. Cote why he needed the DOT medical card, and if he would still have a job if he could not pass the DOT physical.  *Id.* at ¶ 30; ECF No. 39-1 at 11.  Cote replied that "he would have to talk about it."  ECF No. 39-1 at 11.

On May 28, CMPH again informed Cote Corp. that it would not provide an opinion as to whether Morissette was medically qualified until it received more

---

[2] Daniel A. Cote is Cote Corp.'s chief executive officer and Daniel P. Cote is Cote Corp.'s vice president of operations.  ECF No. 35 at 1, ¶ 3.  For clarity's sake, I use each man's full name throughout the order.

4

information. ECF No. 39 at 16-17, ¶ 33.  Around the same time, Morissette alleges that he complained to his co-workers that he did not need a DOT medical card to perform the work of the shop mechanic position, and stated that if Cote Corp. fired him, he would call OSHA, and Cote Corp. would have to "open up [their] checkbook, [and] they will pay dearly." *Id.* at 17, ¶¶ 34, 35; ECF No. 1 at 4, ¶ 30; ECF No. 39-1 at 9.  On May 31, Cote Corp. terminated Morissette's employment, based on its belief that he could not handle the stress of obtaining the DOT medical card.  ECF No. 35 at 3, ¶ 18; ECF No. 39 at 17, ¶ 40; ECF No. 40 at 21.  Later the same day, CMPH sent Cote Corp. a fax stating that it had determined that Morissette had passed the DOT medical exam.  ECF No. 39 at 18, ¶ 43.

Shortly after being terminated, Morissette filed a Notice of Complaint against Cote Corp. with the United States Department of Labor's Occupational Safety and Health Administration ("OSHA").  *See* ECF No. 40-2 at 1.  In response, Daniel A. Cote wrote a letter to OSHA dated June 27, 2013, stating, among other things, that Morissette had not previously disclosed his stroke history, and that:

> I was surprised to hear of the stroke as he had not mentioned it prior. He claims he told us during the interview. The interview team included: Daniel A. Cote (myself), Daniel P. Cote (VP Operations), and Kevin Robinson (Fleet Manager). If Mr. [Morissette] had stated or mentioned a stroke we certainly would have questioned him further. All three of us concurred. It was not brought up. Our concern with the stroke is that it potentially could prevent a DOT Medical Card from being obtained. We need our mechanic to drive Class A and Class B vehicles for road test and evaluation, it is a critical aspect of the job responsibilities.

*Id.* at 2.

## II. SUMMARY JUDGMENT STANDARD

### A.      Federal Rule of Civil Procedure 56

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014). In making that determination, a court must view the evidence in the light most favorable to the non-moving party. *Johnson v. Univ. of P.R.*, 714 F.3d 48, 52 (1st Cir. 2013). "[A] judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (citations and quotations omitted).

### B.      Local Rule 56

Local Rule 56 defines the evidence that this court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment. First, the moving party must file a statement of material facts that it claims are not in dispute, with each fact presented in a numbered paragraph and supported by a specific citation to the record. *See* Loc. R. 56(b).

Second, the non-moving party must submit its own short and concise statement of material facts in which it admits, denies, or qualifies the facts alleged by the moving party, making sure to reference each numbered paragraph of the moving party's statement and to support each denial or qualification with a specific citation to the record. Loc. R. 56(c). The non-moving party may also include its own statement of additional facts that it contends are not in dispute. *Id.* These additional

6

facts must also be presented in numbered paragraphs and be supported by a specific citation to the record. *Id.*

Third, the moving party must then submit a reply statement of material facts in which it admits, denies, or qualifies the non-moving party's additional facts, if any. Loc. R. 56(d). The reply statement must reference each numbered paragraph of the non-moving party's statement of additional facts and each denial or qualification must be supported by a specific citation to the record. *Id.*

The court may disregard any statement of fact that is not supported by a specific citation to the record, Loc. R. 56(f), and the court has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact." *Id.*; *see also, e.g., Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010); Fed. R. Civ. P. 56(e)(2). Properly supported facts that are contained in a statement of material or additional facts are deemed admitted unless properly controverted. Loc. R. 56(f).

## III. LEGAL ANALYSIS

### A.   Discriminatory Termination

The ADA defines a "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment[.]" 42 U.S.C.A. § 12102(1) (2016). To prevail on a disability discrimination claim, Morissette must establish by a preponderance of the evidence that (1) he has a disability within the meaning of the ADA; (2) he is qualified to perform the essential functions of the job, with or without reasonable accommodations; and (3) he was

7

subject to an adverse employment action based in whole or part on his disability. *Ramos-Echevarría v. Pichis, Inc.,* 659 F.3d 182, 186 (1st Cir. 2011) (citing *Jacques v. Clean-Up Grp., Inc.,* 96 F.3d 506, 511 (1st Cir. 1996)) (other citation omitted); *see also Dudley v. Hannaford Bros. Co.,* 190 F. Supp. 2d 69, 73 (D. Me. 2002), *aff'd* 333 F.3d 299 (1st Cir. 2003) ("Courts have interpreted the ADA and MHRA statutes as coextensive.") (citations omitted).  Morissette may either present direct evidence of discrimination or prove discrimination indirectly with circumstantial evidence "by using the *prima facie* case and burden shifting methods that originated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 . . . (1973)." *Ramos-Echevarría,* 659 F.3d at 186 (quoting *Jacques,* 96 F.3d at 511).

### 1. Direct Evidence of Discriminaton

#### a. OSHA Letter

Morissette claims to have direct evidence of disability discrimination by Cote Corp. in the form of Daniel A. Cote's June 27, 2013, letter to OSHA.  ECF No. 38 at 11-12, 13-14 (citing ECF No. 39 at 15, ¶ 26 (citing ECF No. 40-2 at 2)).  Morissette contends that the letter "epitomizes the unfounded concerns, mistaken beliefs, fears, myths, or prejudice about disabilities that the ADA bars from consideration in employment decisions[,]"  ECF No. 38 at 12 (citation and quotation marks omitted), and relieves him of the obligation to establish a *prima facie* case of ADA discrimination under the *McDonnell Douglas* framework, *see id.* at 13.  Instead, Morissette argues that he "need prove only that the discriminatory action was a motivating factor in an adverse employment decision."  *Id.* (quoting *Patten v. Wal-Mart Stores East, Inc.,* 300 F.3d 21, 25 (1st Cir. 2002) (quotation marks omitted)).

Direct evidence is that which "unambigously implicates a disability discrimination motive[,]" *Patten,* 300 F.3d at 25, and "consists of statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision," *id.* (quoting *Febres v. Challenger Caribbean Corp.,* 214 F.3d 57, 60 (1st Cir. 2000) (citation and quotation marks omitted)); *see also Wennik v. Polygram Grp. Distrib., Inc.,* 304 F.3d 123, 132-33 (1st Cir. 2002) (quoting *Kirk v. Hitchcock Clinic,* 261 F.3d 75, 79 (1st Cir. 2001)).   For a statement to constitute direct evidence, the First Circuit requires that the statement give a "'high degree of assurance' that a termination was attributable to discrimination." *Patten*, 300 F.3d at 25 (quoting *Fernandes v. Costa Bros. Masonry, Inc.,* 199 F.3d 572, 580 (1st Cir. 1999) (quotation marks omitted) (*abrogated on other grounds by Desert Palace, Inc. v. Costa,* 539 U.S. 90 (2003)).   "A statement that can plausibly be interpreted two different ways—one discriminatory and the other benign—does not directly reflect illegal animus, and, thus, does not constitute direct evidence." *Id.* (quoting *Fernandes,* 199 F.3d at 583 (quotation marks omitted)).   Consequently, "direct evidence is relatively rare." *Id.* (quoting *Fernandes*, 199 F.3d at 580 (quotation marks omitted)).

Daniel A. Cote's statements in his June 2013 letter to OSHA are not direct evidence of discrimination.  Both statements, that "[i]f Mr. [Morissette] had stated or mentioned a stroke, we certainly would have questioned him further[,]" and that "[the stroke] potentially could prevent a DOT Medical Card from being obtained[,]" ECF No. 40-2 at 2, can plausibly be interpreted as benign expressions of a business concern regarding whether or not a new employee can satisfy a licensing requirement

reasonably related to the employment position.  Cote also stated in the OSHA letter that "[w]e need our mechanic to drive Class A and Class B vehicles for road test and evaluation," and that "it is a critical aspect of the job responsibilities."  *Id.*  Therefore, Daniel A. Cote's statements do not unambiguously reflect unlawful animus.  *See Fernandes,* 199 F.3d at 583 (finding business owner's statements, which could plausibly be interpreted either as discriminatory or benign, did not constitute direct evidence of discrimination).

### b. DOT Medical Exam Requirement

Morissette also contends that the fact that Cote Corp. required certain employees to pass a DOT medical exam and obtain a DOT medical card is evidence of discrimination against people with actual or perceived disabilities.  ECF No. 38 at 12.  Morissette argues that "[t]here is no legal requirement that a person possessing a [commercial driver's license ("CDL")] have a DOT medical card to road test vehicles intrastate that are not transporting passengers or property."  *Id.* (citing *Samson v. Fed. Express Corp.,* 746 F.3d 1196, 1203-04 (11th Cir. 2014) (concluding that "intrastate drivers of an interstate motor carrier" generally are not subject to Federal Motor Carrier Safety Regulations); *Cleary v. Fed. Express Corp.,* 313 F. Supp. 2d 930, 936 (E.D. Wis. 2004) (concluding, in dispute over whether plaintiff was a qualified individual, that Federal Motor Carrier Safety Regulations apply only to employees who transport property or passengers in interstate commerce)).

Cote Corp. responds that the holdings in *Samson* and *Cleary* do not apply to this case because they are limited to the issue of whether the ability to pass a DOT medical exam is an essential function of a mechanic's position, whereas it does not

claim that Morissette was unable to perform the essential functions of his job. ECF No. 47 at 5. Rather, Cote Corp. argues, it required its employees to pass the DOT medical exam "to allow them greater flexibility to perform the various tasks and responsibilities" of the job. *Id.*

Morissette's argument—that Federal Motor Carrier Safety Administration regulations do not require a DOT medical card in order to road test vehicles that are not driven out of state and are not transporting passengers or property—fails to account for record evidence that Cote Corp. transported interstate freight in Maine, and that it required its employees to "wear multiple hats" and reasonably expected its employees to occasionally "retrieve a truck that may have freight on it[.]" ECF No. 41 at 9. For this reason, the DOT medical exam requirement does not unambiguously imply a discriminatory animus nor give a "high degree of assurance" that Morissette's termination was attributable to discrimination. *See Patten,* 300 F.3d at 25 (citation and internal quotation omitted).

**2. Circumstantial Evidence of Discrimination**

To indirectly prove an ADA discrimination claim by circumstantial evidence under the *McDonnell Douglas* burden-shifting analysis, Morissette must offer evidence sufficient to establish a *prima facie* case: that he (1) has a disability within the meaning of the ADA; (2) is qualified to perform the essential functions of the job with or without reasonable accommodations; (3) was subject to an adverse employment action by a company subject to the ADA; (4) was replaced by a non-disabled person or was treated less favorably than non-disabled employees; and (5)

11

suffered damages as a result. *Ramos-Echevarría,* 659 F.3d at 186 (quoting *Jacques,* 96 F.3d at 511 (quotation marks and other citation omitted)).

If Morissette establishes a *prima facie* case, then Cote Corp. assumes the burden of producing evidence of a legitimate, non-discriminatory reason for his discharge, after which the burden once again returns to Morissette to produce evidence that the reason offered by Cote Corp. is pretextual. *Freadman v. Metro. Prop. and Cas. Ins. Co.,* 484 F.3d 91, 99 (1st Cir. 2007); *see also Fuhrmann v. Staples Office Superstore East, Inc.*, 2012 ME 135, ¶ 13, 58 A.3d 1083.

### a. Prima Facie Case

### i. Disability Under the ADA

Courts apply a three-part analysis to determine whether an impairment qualifies as a disability under the ADA. *Bragdon v. Abbott,* 524 U.S. 624, 631 (1998); *Ramos-Echevarría,* 659 F.3d at 187; *see also McDonough v. Donahoe,* 673 F.3d 41, 46-47 & n.11 (1st Cir. 2012) (interpreting the meaning of the word "disabled" under the Rehabilitation Act and noting that the phrase "individual with a disability" is defined similarly in both it and the ADA).

First, Morissette must establish that he suffers from a physical or mental impairment. *Ramos-Echevarría,* 659 F.3d at 187 (citing *Carroll v. Xerox Corp.,* 294 F.3d 231, 238 (1st Cir. 2002)) (footnote omitted)). Second, he must establish that the impairment affects life activities that are "major," i.e., "of central importance to daily life." *Id.* (citing *Carroll,* 294 F.3d at 238). Major life activities include "major bodily function[s]" such as neurological and circulatory functions. 42 U.S.C.A. § 12102(2)(B). Third, Morissette must show that the impairment "substantially limits" the identified

12

major life activity. *Ramos-Echevarría,* 659 F.3d at 187 (citing *Carroll,* 294 F.3d at 238) (other citation omitted).

In 2008, Congress passed the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553, with the stated goal of ensuring that "[t]he definition of disability . . . be construed in favor of broad coverage of individuals under [the ADA]." 42 U.S.C.A. § 12102(4)(A); *see also* 29 C.F.R. Pt. 1630, App'x § 1630.1(c) (2014). To achieve this goal, Congress "took aim directly at judicial interpretation of the 'substantially limits a major life activity' aspect of the then-current definition of 'disability,' and it instructed the [Equal Employment Opportunity Commission ("EEOC")] to modify its regulations to address those concerns." *Morriss v. BNSF Ry. Co.,* 817 F.3d 1104, 1110 (8th Cir. 2016). In response, the EEOC revised the definition of "substantially limits" in the ADA implementing regulations to remove the requirement that an impairment "prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Id.*; *see* 29 C.F.R. § 1630.2(j)(1)(ii). The post-ADAAA regulations also state that the term "'substantially limits' is not meant to be a demanding standard," and shall be "broadly construed in favor of expansive coverage[.]" 29 C.F.R. § 1630.2(j)(1)(i). "[T]he threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis." *Id.* § 1630.2(j)(1)(iii).

Morissette argues that he meets the statutory definition of disability by virtue of his stroke history and carotid artery disease, paired with the "total and permanent occlusion" of his right carotid artery, which he claims to be a physical impairment

that substantially limits his circulatory and neurological functions. ECF No. 38 at 8. For evidentiary support, Morissette cites the deposition testimony of Nurse Practitioner Leane Sprague, who treated him in 2011 and 2012 and was involved in his care after his release from the hospital. ECF No. 39 at 11, ¶¶ 1, 3, 4, 5 (citing ECF No. 39-4 at 3). Sprague testified that Morissette had carotid artery disease, stroke history, and a right carotid artery occlusion, all of which require medication and follow-up for prevention of further disease. ECF No. 39-4 at 4-5. Sprague also testified that Morissette had a problem with the operation of his circulatory system due to his carotid artery disease. *Id.* at 6.

Morissette also cites Nurse Practitioner Herdrich's May 2013 letter in which she recounted that, at his most recent appointment in November 2012, Morissette had "continued to recover use of his left arm." ECF No. 39-6 at 1. Herdrich also stated that as of May 2013, Morissette's "[r]isk of stroke [was] less than 5% per year for the next 5 years, similar to the general population." *Id.*

### (1) Physical Impairment

The EEOC regulations that implement the ADA ("ADA regulations") define a "physical impairment" as "[a]ny physiological disorder or condition . . . affecting one or more body systems, such as neurological . . . [or] circulatory[.]" 29 C.F.R. 1630.2(h)(1). Thus, Sprague's testimony that Morissette had a problem with the operation of his circulatory system, ECF No. 39-4 at 6, and Herdrich's letter indicating that Morissette's recovery of the full use of his arm after his stroke was ongoing, ECF No. 39-6 at 1, both satisfy the first prong of the disability analysis.

14

### (2) Major Life Activities

The ADA regulations define "major life activities" to include "[t]he operation of a major bodily function, including . . . neurological . . . [and] circulatory . . . functions." 29 C.F.R. § 1630.2(i)(1)(ii).  So, Morissette satisfies the second prong.  *See* ECF No. 1 at 5, ¶ 36.

### (3) Substantial Limitation

### (a) Circulatory Function

The ADA regulations state that "[a]n impairment is a disability within the meaning of [§ 1630.2(j)] if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population."  29 C.F.R. § 1630.2(j)(1)(ii).  Cote Corp. argues that Morissette cannot establish that his 2011 stroke "substantially limited" his circulatory system because Morissette himself described his 2011 stroke as "mild[,]" ECF No. 34 at 7 (citing ECF No. 35 at 2, ¶ 4) (citing ECF No. 35-2 at 6)), and because Nurse Practitioner Herdrich estimated Morissette's risk of stroke to be "less than 5% per year for the next 5 years, similar to the general population[,]" *id.* (quoting ECF No. 35-5 at 1; citing 29 C.F.R. § 1630.2(j)(1)(ii)).  Cote Corp. also cites the fact that Morissette took "only" an aspirin per day since his stroke, ostensibly showing that his circulatory function is not substantially limited.  *Id.*

Morissette, on the other hand, argues that his medical history of an occluded right carotid artery, plus "common sense," would support a reasonable jury in concluding that his stroke history and artery disease amount to a substantial limitation on his circulatory function.  ECF No. 38 at 8.  He cites Sprague's testimony

15

in which she attests to his blocked right carotid artery, characterizes him as having "a circulatory problem," and describes his carotid artery disease as permanent and agreed that his circulatory problem was "fairly substantial." *Id.* at 7-8 (citing ECF No. 39 at 11-12, ¶¶ 1, 3-7). Sprague also testified that Morissette's carotid artery disease lasted more than six months and was the subject of ongoing medication and monitoring. ECF No. 39 at 11-12, ¶¶ 5, 6.

In light of the post-ADAA regulations' instruction that "substantially limits" is not meant to be a demanding standard, and that "the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis[,]" 29 C.F.R. § 1630.2(j)(1)(i), (iii), Morissette meets the relatively low bar set by the ADAA for establishing a disability because a reasonable jury could conclude that he was substantially limited in the major life activity of his circulatory function, *see* 42 U.S.C.A. § 12102(2)(B) ("[A] major life activity also includes the operation of a major bodily function, including . . . circulatory . . . functions."). The call is a close one, however, because while Sprague testified that Morissette has an occluded right carotid artery and attendant circulatory problems, ECF No. 39-4 at 6, she did not testify that these conditions "substantially limited" his circulatory function, and, in fact, when asked which of Morissette's major life activities were limited, stated that "I don't believe he had any." ECF No. 39-4 at 5. It is not clear from Sprague's testimony, however, whether she was referring to "major life activities" as defined by the ADA or by a more general, non-legal understanding of that term.

Resolution of these contradictions in Sprague's testimony is appropriately left to a jury because "[t]he court must not consider the credibility of witnesses, resolve

16

the conflicts in testimony, or evaluate the weight of the evidence." *Segrets, Inc. v. Gillman Knitwear Co., Inc.,* 207 F.3d 56, 65 (1st Cir. 2000) (citation and quotation marks omitted). Furthermore, Cote Corp.'s argument on the substantial limitation issue as it relates to circulatory function does not address Morissette's blocked carotid artery or circulatory condition, but instead focuses exclusively on Morissette's stroke; namely, the fact that he characterized it as "mild" and the fact that Nurse Practitioner Herdrich estimated his future risk of stroke as similar to that of the general population. ECF No. 34 at 7. Accordingly, there is a genuine dispute of material fact related to whether Morissette's circulatory problem qualifies as a substantial limitation on a major life activity.

### (b) Neurological Function

Morissette also argues that a jury could reasonably find that his neurological function was substantially limited by virtue of the damage that his 2011 stroke caused, including "persistent left arm and hand weakness." ECF No. 38 at 7-8 (citing ECF No. 39 at 12, ¶¶ 8-10). As evidence of substantial limitation, Morissette cites the following evidence:

- An outpatient physical therapy evaluation dated July 13, 2011, which describes his neurological symptoms approximately one month after he suffered the stroke as "ongoing left-sided weakness, mostly in the left hand, with complaints of dysmetria[3] and a decrease in sensation in his hand." ECF No. 39-8 at 1.

---

[3] The Oxford English Dictionary defines the word "dysmetria" as an "inability to control the range of movement in a muscular action." http://www.oed.com.

- A November 26, 2012, "Vascular Established Patient Visit" report dictated by Nurse Practioner Herdrich which states that Morissette estimated the strength of his left arm "at 75% of the right [arm]." ECF No. 39-9 at 3.

- A medical history questionnaire dated May 20, 2013, which Morissette completed while undergoing the DOT medical exam required by Cote Corp., on which he indicated that he had "[h]and numbness or tingling" in his left hand and further wrote that he experienced numbness if he held a tight grip for more than ten minutes. ECF No. 39-3 at 2.

These hospital and medical care provider records contradict Cote Corp.'s sole asserted basis for summary judgment on the substantial limitation issue with regard to neurological function, which is that Morissette "has produced no document or testimony showing any 'neurological condition' as alleged in his Complaint[,]" and no evidence to support such a claim. ECF No. 34 at 7-8. Based upon the foregoing evidence, and resolving all inferences in Morissette's favor, I conclude that a reasonable jury could conclude that his history of stroke left him with a physical impairment that substantially limited his neurological function.

### ii. Qualifications and Adverse Employment Action

Cote Corp. concedes that Morissette was qualified and that his termination was an adverse employment action. ECF No. 34 at 6. Moreover, Cote Corp. does not advance an argument on the damages element of Morissette's prima facie case. *See* ECF No. 34. I therefore resolve these issues in Morissette's favor.

18

### iii. Replacement By a Non-Disabled Person

Cote Corp. asserts that it did not hire a non-disabled person, or any new person, to replace Morissette, but instead "filled his position with existing employees adding job responsibilities as required."  ECF No. 47 at 7; ECF No. 35 at 4, ¶ 20.

Morissette argues that, to the contrary, Cote Corp. hired Jeremy Soucy, who is not disabled, as a mechanic on June 17, 2013.  ECF No. 39 at 18, ¶¶ 44, 45.  Morissette also contends that Cote Corp. moved its existing fleet manager, Jonathan McCaslin, to the position of fleet manager/mechanic and that the balance of Morissette's mechanic responsibilities were absorbed by an existing crane operator, Mark Mercier. *Id.,* ¶ 44.  Morissette contends that neither McCaslin nor Mercier are disabled.  *Id.,* ¶ 45.  Morissette also cites Daniel A. Cote's deposition testimony, in which he admits that Soucy was hired as a mechanic on June 17, 2013, but denies that Soucy was hired to fill the vacancy left by Morissette's termination and claims that Soucy "was already hired to come onboard[.]"  ECF No. 40 at 14-15.  Cote also denied that McCaslin's position changed from that of fleet manager to mechanic, but instead retained his duties as fleet manager while also performing mechanic duties as needed.  *Id.* at 15.  Cote testified that Mercier and others "had to fill in [as a mechanic] as we went along."  *Id.*

A discharged employee "is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." *LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 846 (1st Cir. 1993) (discussing the standard under the Age Discrimination in Employment Act) (citation and quotation marks

omitted).   Cote's testimony as cited by Morissette establishes that McCaslin and Mercier assumed some of Morissette's responsibilities in addition to their own, and thus did not "replace" Morissette for purposes of establishing a prima face case of discriminatory termination.   However, Daniel A. Cote's admission that Soucy was hired on June 17, 2013, more than two weeks after Morissette's termination, undermines Cote Corp.'s claim that Soucy was "already hired to come onboard," ECF No. 40 at 14-15, and thus creates a dispute of material fact as to whether Morissette was replaced by a non-disabled person after his termination.

Given the foregoing analysis of all the required elements, Morissette has established a prima facie case of discriminatory termination.   I now turn to the question of whether Cote Corp. has articulated a legitimate, non-discriminatory reason for terminating Morissette.

### b. Legitimate Non-discriminatory Reason

Cote Corp. claims that it fired Morissette for insubordination because he told his co-workers that a medical card should not be a condition of his employment as a mechanic and stated that, if Cote Corp. fired him, then he would "make Cote pay" by reporting safety violations that he allgedly observed at Cote Corp. to OSHA.   ECF No. 34 at 10-11.   Cote Corp. also claims that Morissette's conduct was an "overreaction to the relatively minor stress of having to get his medical card, and was not acceptable conduct for a probationary employee."   *Id.* at 11.

Morissette alternately denied and qualified his responses to Cote Corp.'s statements of material fact on this issue, ECF No. 39 at 5-8, ¶¶ 14, 16, 17, but ultimately, he admitted making the threat to make Cote "pay" to his co-workers when

20

questioned under oath at his deposition.  ECF No. 39-1 at 9 ("Q. Did you say to anybody that the company would pay if they terminated you? A. I believe that's what I said, yes.").  Morissette asserts that this statement was protected because (1) he made it in opposition to discriminatory treatment and (2) employers are barred from invoking insubordination as a means of justifying retaliation against an employee. ECF No. 38 at 16-17 (citing *Kelley v. Corr. Med. Servs., Inc.,* 707 F.3d 108, 116, 118 (1st Cir. 2013)).  These arguments both fail.  The first argument is a conclusory argument predicated on Morissette's claim that the DOT medical exam requirement is *per se* discriminatory and that, therefore, Cote Corp. cannot discipline Morissette for his "righteous objection" to it.  *Id.*  Yet Morissette has not established that Cote Corp.'s DOT medical exam requirement constitutes direct evidence of discrimination, *see supra,* so it cannot be said that opposing the requirement necessarily constitutes opposing discrimination.  Morissette's second argument, that Cote Corp. is barred from invoking insubordination "to mask retaliation for requesting an accommodation," *id.* at 17, really concerns pretext instead of articulating how Cote Corp.'s stated reason for terminating him is either illegitimate or discriminatory.  It also more closely relates to Morissette's failure to accommodate claim and his retaliation claim rather than his discriminatory termination claim.

Morissette's objection also fails because a summary judgment defendant has a low burden when proffering a legitimate, non-discriminatory reason in the *McDonnell-Douglas* analysis. *Texas Dep't of Comty. Affairs v. Burdine,* 450 U.S. 248, 254 (1981) ("The defendant need not persuade the court that it was actually motivated by the proffered reasons.  It is sufficient if the defendant's evidence raises

a genuine issue of fact as to whether it discriminated against the plaintiff.") (citation and footnote omitted). Cote Corp.'s evidence in the form of Morissette's testimony and citation to the Complaint, ECF No. 35 at 3, ¶¶ 13, 14 (citing ECF No. 1 at 4, ¶ 30; ECF No. 35-2 at 7-8), raises just such an issue of fact. Thus, Cote Corp. has articulated a legitimate, non-discriminatory business reason for terminating Morissette's employment. *McDonnell Douglas Corp.,* 411 U.S. at 802.

### c. Pretext

The burden now shifts to Morissette to show pretext by demonstrating "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the non-discriminatory reasons offered by Cote Corp. that are sufficient to permit a factfinder to conclude that Cote Corp.'s decision to terminate his employment was not for the stated reason and that the real reason was discriminatory bias. *Soto-Feliciano v. Villa Cofresí Hotels, Inc.*, 779 F.3d 19, 29 (1st Cir. 2015) (quoting *Gómez–González v. Rural Opportunities, Inc.,* 626 F.3d 654, 662-63 (1st Cir. 2010) (quotation marks omitted); *see also Ray v. Ropes & Gray LLP*, 799 F.3d 99, 113 (1st Cir. 2015).

Morissette meets this burden because he identifies a contradiction in Cote Corp.'s assertion that it required its mechanics to have a DOT medical card. Specifically, Charles Comeau, a Cote Corp. employee who was hired in 2001 and worked as a mechanic from 2002 until 2013, testified that he was never told that having a commercial driver's license or a DOT medical card was a requirement of working as a mechanic at Cote Corp. ECF No. 38 at 19 (citing ECF No. 39 at 19-20, ¶ 53) (citing ECF No. 41-7 at 4). Morissette also argues that there is no evidence in

the record that Cote Corp. required Jeremy Soucy to pass a DOT medical exam when it hired him as a mechanic in June 2013. *Id.* (citing ECF No. 39 at 20, ¶ 54).

If a factfinder believes that neither Comeau nor Soucy was required to obtain a DOT medical card, then the factfinder could also disbelieve Cote Corp.'s assertion that it fired Morissette in part because he "was very unhappy with the *requirement* of the medical card and the pressure or stress from this was more than he could adequately handle." ECF No. 35 at 3, ¶ 16 (emphasis added). Furthermore, nowhere in the record is there any allegation that either Comeau or Soucy was disabled; thus, such inconsistent treatment between Morissette, on the one hand, and Comeau and Soucy, on the other hand, if true, could be viewed by a reasonable jury as evidence that the real reason for Morissette's termination was Cote Corp.'s concern over his stroke history and artery disease.

### i. "Same Actor" Inference

Morissette testified at his deposition that he disclosed his stroke history to Daniel A. Cote and Daniel P. Cote during his job interview in May 2013. ECF No. 35 at 1-2, ¶¶ 3, 4 (citing ECF No. 35-2 at 6). Cote Corp. contends that both men hired Morissette without that knowledge. ECF No. 34 at 13. But, Cote Corp. argues, if the Cotes harbored a discriminatory animus against Morissette on the basis of his stroke history, then they would not have hired him in the first place. *Id.* Therefore, Cote Corp. contends that it is entitled to an inference that discrimination was not a determining factor in its decision to fire Morissette. *Id.* at 12-14 (quoting *LeBlanc*, 6 F.3d at 847 ("[I]n cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the

23

hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer.") (citation and quotation marks omitted)).

The problem with Cote Corp.'s argument is that, ironically, Morissette's testimony is contradicted by Daniel A. Cote, who testified that Morissette did not disclose his stroke history until after he returned from his DOT medical exam, and not previously at the job interview.  ECF No. 40 at 17.  Daniel A. Cote's June 2013 letter to OSHA also contradicts Morissette's testimony:

> I indicated to [Morissette] I was surprised to hear of the stroke as he had not mentioned it prior. He claims he told us during the interview. The interview team included: Daniel A. Cote (myself), Daniel P. Cote (VP Operations), and Kevin Robinson (Fleet Manager).  If Mr. [Morissette] had stated or mentioned a stroke we certainly would have questioned him further.  All three of us concurred.  It was not brought up.

ECF No. 40-2 at 2.  These opposite versions concerning whether Morissette informed Cote Corp. of his stroke history at his job interview or afterwards constitute a genuine dispute of fact and preclude inferring that discrimination was not a determining factor in Cote Corp.'s decision to fire Morissette.

Even if, as Cote Corp. argues, the evidence established that Morissette had disclosed his stroke history at his job interview, the "same actor" inference would not *compel* judgment for Cote Corp., because even when the inference is applicable, "it is not mandatory or dispositive in Defendants' favor. Rather, it merely weakens Plaintiff's evidence of discrimination."  *Garrett v. Sw. Med. Clinic,* 631 Fed. App'x 351, 357 (6th Cir. 2015) (citation and quotation marks omitted).

24

## B.   Failure to Accommodate

In addition to alleging discriminatory termination, Morissette also alleges that Cote Corp. failed to reasonably accommodate his disability.  ECF No. 1 at 7, ¶ 52.  He claims that on May 27, 2013, he asked Daniel A. Cote why he needed a DOT medical card and whether he would still have a job if he did not pass the DOT medical exam. ECF No. 39 at 16, ¶¶ 30, 31 (citing ECF No. 40 at 20-21); ECF No. 39-1 at 11.[4]  Cote replied that "they would have to talk about that later, and that he wanted to see Mr. Morissette's doctor's letter as well as the medical card."  ECF No. 1 at 4, ¶ 29; ECF No. 39-1 at 11.  For the reasons explained below, this evidence does not constitute a request for a reasonable accommodation.

To state a disability discrimination claim based upon a failure to accommodate, a plaintiff must show that: (1) he is a handicapped person within the meaning of the statute; (2) he is qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the employer knew of his disability but did not reasonably accommodate it upon a request.  *Henry v. United Bank*, 686 F.3d 50, 59-60 (1st Cir. 2012).  The employee bears the initial burden of making a sufficiently

---

[4] Morissette's Statement of Additional Material Facts states that Morissette asked "whether he *could* still have a job if he did not pass the DOT physical[.]"  ECF No. 39 at 16, ¶ 31 (emphasis added). The cited portion of Daniel A. Cote's testimony contains a small yet important difference, however.  Cote was asked at his deposition whether he had any further communications with Morissette about whether he might be able to keep the job "after Mr. Morissette asked you on the 27th whether *he'd* still have a job if he didn't get his medical card[.]"  ECF No. 40 at 20-21 (emphasis added).  The same difference exists between Morissette's Statement of Additional Material Facts  and his deposition testimony, in which Morissette stated that "I asked him if I *would* still have a job if I could not obtain a medical card."  ECF No. 39-1 at 11 (emphasis added).

The difference between Morissette asking if he *could* still have a job or whether he *would* still have a job is the difference between, on the one hand, stating a request to remain in his position despite not obtaining a DOT medical card, and, on the other hand, asking what the consequences would be of not obtaining such a card.  The cited testimony makes clear that Morissette asked if he *would* still have a job.

direct and specific request for accommodation, unless the employer otherwise knew that one was necessary. *Jones v. Nationwide Life Ins. Co.,* 696 F.3d 78, 89 (1st Cir. 2012) (citing *Freadman*, 484 F.3d at 102 (A plaintiff's request "must be sufficiently direct and specific," and "must explain how the accommodation requested is linked to some disability.")). While the employee need not mention the ADA, or even use the term "accommodation," *Schmidt v. Safeway Inc.,* 864 F. Supp. 991, 997 (D. Or. 1994), he must nevertheless explain how the accommodation is linked to his disability, meaning "not only notice of a condition, but of a causal connection between the major life activity that is limited and the accommodation sought[,]" *Jones,* 696 F.3d at 89 (citations and quotation marks omitted).

Morissette contends that asking Daniel A. Cote why he needed a DOT medical card and whether he would still have a job if he did not pass the medical exam constitutes a request for an accommodation, and that this alleged request was reasonable since other Cote Corp. employees could have performed any driving that was necessary. ECF No. 38 at 21 (arguing that "[t]he issue of whether an accommodation is reasonable is normally a question of fact, unsuited for determination on summary judgment." (quoting *Scalera v. Gen. Elec. Co.,* 2015 WL 7258477, at *8 (D. Me., Nov. 17, 2015))). This latter argument presupposes the former argument—that he made a request for an accommodation that was sufficiently direct and specific. To the contrary, Morissette's question to Daniel A. Cote asking whether he would have a job if he did not obtain a DOT medical card does not, on its face, constitute a direct and specific request to waive the medical card requirement or an

explicit notice to Cote Corp. that Morissette needed a special accommodation. This conclusion is bolstered by Morissette's deposition testimony:

> Q. Did you ever request accommodations while you were at Cote?
>
> A. I felt with the disability from a stroke that I wouldn't have to have [a] medical card to perform my duties.
>
> Q. Did you tell that to Mr. Cote, Sr.?
>
> A. Just asking why we needed a medical card.

ECF No. 39-1 at 10. Nothing about this testimony suggests that Morissette specifically requested that Cote Corp. waive its DOT medical card requirement. *See also Reed v. LePage Bakeries, Inc.,* 244 F.3d 254, 261 (1st Cir. 2001) ("the ADA's reasonable accommodation requirement usually does not apply unless triggered by a request" from the plaintiff) (citation, footnote, and internal quotation marks omitted); *Gallagher v. Unitil Serv. Corp.,* 2015 WL 5521794, at *9 (D. N.H. Sept. 17, 2015) ("Typically, the ADA's reasonable accommodation requirement is not triggered until the employee makes a request[.]") (citation and quotation marks omitted).

Because Morissette has failed to establish the third element of a prima facie case based upon a failure to accommodate, Cote Corp. is entitled to summary judgment on Morissette's failure to accommodate claim.

## C.    Retaliatory Termination

Morissette also alleges that Cote Corp. terminated his employment because he requested a reasonable accommodation and, alternatively, because he "opposed discriminatory treatment because of his disability." ECF No. 1 at 7, ¶ 53. To make out a prima facie claim of ADA retaliation, Morissette must show that: 1) he engaged in protected conduct; 2) he experienced an adverse employment action; and 3) there

27

was a causal connection between the protected conduct and the adverse employment action." *Kelley,* 707 F.3d at 115 (citing *Calero–Cerezo v. U.S. Dep't of Justice,* 355 F.3d 6, 25 (1st Cir. 2004)).  There is no dispute that Morissette suffered an adverse employment action when he was terminated, and so there is no dispute regarding the second prima facie element.

### 1. Protected Conduct

Morissette claims that he engaged in protected conduct based on two theories: first, he claims that he "oppos[ed] Cote [Corp.'s] discriminatory requirement of the DOT medical card," and second, that he requested a reasonable accommodation.  ECF No. 38 at 22-23.

Morissette cites no legal authority, other than that discussed above regarding direct evidence, and cites no evidence in the record to support his contention that the DOT medical card requirement was discriminatory.  *See* ECF No. 38.  Given my conclusion regarding the direct evidence issue, Morissette's argument rests on nothing more than his conclusory assertion that Cote Corp.'s DOT medical card requirement was discriminatory.  *See Murray v. Warren Pumps, LLC,* 2016 WL 1622833, at *2 (1st Cir., Apr. 25, 2016) ("Conclusory allegations, improbable inferences, and unsupported speculation will not make the grade.") (citations omitted).  Without additional legal or evidentiary support, a jury could not reasonably conclude that the DOT medical card requirement was "discriminatory" and that Morissette's opposition to it was protected conduct.

Morissette's second theory of protected conduct also fails for the same reasons discussed above concerning his failure to establish a prima facie case based upon a

failure to accommodate. *See supra.* Although he asserts that he asked "for an accommodation of being allowed to continue employment if he could not pass the DOT physical," ECF No. 38 at 22-23, this claim is not supported by any citation to the record, and conflicts with his own characterization of the exchange he had with Daniel A. Cote. ECF No. 39-1 at 10 ("Q. Did you ever request accommodations while you were at Cote? . . . A. I felt with the disability from a stroke that I wouldn't have to have [a] medical card to perform my duties. Q. Did you tell that to Mr. Cote, Sr.? A. Just asking why we needed a medical card."). Without record support, Morissette's claim that he engaged in protected conduct in the form of a request for an accommodation is also conclusory, *see Murray,* 2016 WL 1622833, at *2, and insufficient for a reasonable jury to conclude that Morissette engaged in protected conduct.

Accordingly, Morissette has failed to establish the first element of a prima facie case based upon ADA retaliation, and Cote Corp. is entitled to summary judgment on Morissette's ADA retaliation claim.

## D.   Compensatory and Punitive Damages

Cote Corp. argues that any damages that may rewarded resulting from Morissette's ADA retaliation claim must be limited to back pay, pursuant to the ADA and ADAA. ECF No. 34 at 20-21 (citing *Kramer v. Banc of Am. Sec., LLC,* 355 F.3d 961, 965 (7th Cir. 2004) ("We agree . . . that a meticulous tracing of the language of this tangle of interrelated statutes reveals no basis for plaintiff's claim of compensatory and punitive damages in his ADA retaliation claim. We thus conclude

29

that . . . compensatory and punitive damages are not available.") (citation and internal quotation marks omitted)).

Because I have concluded that summary judgment in favor of Cote Corp. is appropriate with regard to Morissette's ADA retaliation claim, I need not decide the question of whether a plaintiff can recover compensatory and punitive damages for an ADA retaliation claim.

## IV. CONCLUSION

For the foregoing reasons, Cote Corp.'s Motion for Partial Summary Judgment (ECF No. 34) is **GRANTED IN PART** as to Morissette's claims for failure to accommodate and retaliation under the ADA and MHRA. Counts I and II are **DISMISSED IN PART** as to the failure to accommodate claim and the retaliation claim, only.  Cote Corp.'s Motion for Partial Summary Judgment (ECF No. 34) is **DENIED IN PART** as to Morissette's claim of discriminatory termination under the ADA and the MHRA, and therefore, Counts I and II remain before the court as to this issue only.

Morissette's WPA claim, which is contained in Count III, was not at issue in Cote Corp.'s motion and remains before the court.

**SO ORDERED.**

**Dated this 31st day of May 2016.**

_____
        **/s/ Jon D. Levy**
        **U.S. DISTRICT JUDGE**
